IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
ASSIGNED ON BRIEFS JANUARY 6, 2005

**STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES v.
DALE BARUCHMAN**

**IN THE MATTER OF: B.B. (d/o/b 11/16/90) and H.B. (d/o/b 3/2/89)**

Direct Appeal from the Chancery Court for Shelby County
No. CH-02-0344     D. J. Alissandratos, Chancellor

---

**No. W2004-02071-COA-R3-PT - Filed March 29, 2005**

---

This is a parental termination case involving a mother with a documented history of severe mental illness. The Department of Children's Services filed a petition to terminate the mother's parental rights to her minor son in February 2002, alleging the grounds of persistent conditions and failure to substantially comply with the permanency plans. The department filed an amended petition in August 2002, seeking to terminate the mother's parental rights to her minor daughter based upon the same grounds. In September 2002, the department filed another amended petition alleging as an additional ground for termination the mother's mental incompetence. Following a hearing over two non-consecutive days, the chancery court entered an order finding the department had proven all the grounds it alleged for terminating the mother's parental rights by clear and convincing evidence, and terminating the mother's parental rights would be in the children's best interest. While we disagree with the trial court's finding that DCS proved each ground for termination by clear and convincing evidence, we affirm the chancery court's decision to terminate the mother's parental rights.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

William T. Winchester, Memphis, TN, for Appellant

Paul G. Summers, Attorney General & Reporter, Elizabeth C. Driver, Assistant Attorney General, Nashville, TN, for Appellee

# OPINION

## I.
### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The circumstances leading to the filing of the petitions for termination of the parental rights of Dale Baruchman ("Mother") began in 1984. In 1984, the Tennessee Department of Children's Services ("DCS") received a referral regarding Mother's mental state after she exhibited strange behavior following the birth of her oldest daughter, B.J.B. (dob: 04/30/1984).[1] DCS sent Mother to the LeBonheur Center for Children and Parents ("LCCP") to be evaluated. Dr. Sonny Gentry ("Dr. Gentry"), a clinical psychologist with LCCP, conducted the evaluation and determined that Mother was "a very disturbed individual," presenting symptoms of schizophrenia. Dr. Gentry did not believe Mother could appropriately parent B.J.B., therefore, he recommended that DCS not return B.J.B. to Mother's custody and recommended that Mother undergo psychological counseling to address her mental problems. In 1985, Dr. Gentry conducted a follow-up evaluation of Mother and determined that, while she had made "slight improvement," Mother had not improved enough mentally to warrant returning B.J.B. to her custody. Dr. Gentry recommended that Mother undergo further psychiatric treatment. Accordingly, DCS retained custody of B.J.B. from 1984 until 1987 when DCS returned B.J.B. to Mother's custody.

In 1993, DCS received referrals alleging the abuse and neglect of Mother's children. DCS once again referred Mother and the children to LCCP for evaluations and took custody of the children. By 1993, Mother, in addition to B.J.B., age 9 at the time, had two additional children, B.P.B. (dob: 11/16/1990), age 3 at the time, and H.L.B. (dob: 03/02/1989), age 4 at the time. Dr. Gentry conducted the evaluation and found more evidence of a "schizophrenic-like disorder" in Mother, concluding the symptoms were "much more prominent and obvious." During the course of the evaluation, Dr. Gentry's report indicated that Mother reported two psychiatric hospitalizations. Dr. Gentry recommended that the children remain in long-term foster care while Mother undergo psychiatric treatment. Although the record does not reveal exactly when, at some point following the 1993 evaluation the children were returned to Mother's custody.

In 2000, DCS received another referral regarding Mother after B.P.B. chased H.L.B. with a butcher knife. Mother apparently had B.P.B. arrested and the juvenile court placed B.P.B. in Lakeside Psychiatric Hospital ("Lakeside") for a period of one year. Prior to this incident, B.P.B. had experienced problems in several schools resulting in his expulsion for violent behavior. B.P.B. had also been evaluated by mental health professionals who diagnosed him with ADHD and schizo-type personality disorder. Prior to entering Lakeside, B.P.B. received treatment from several other facilities, but these facilities notified DCS that Mother would not cooperate with her son's treatment, failed to understand his problem, or sought to minimize it. DCS also received reports from Lakeside of problems regarding Mother to the effect that, during visitation, Mother would sneak in contraband to B.P.B. at the facility. Personnel at Lakeside found matches in his clothing which B.P.B.

---

[1] B.J.B. is presently an adult, therefore, the parental rights regarding B.J.B. are not at issue in this case.

apparently used to start a fire at the facility. B.P.B. was released from Lakeside in October 2001 and placed in foster care.

DCS also removed B.J.B. and H.L.B. in 2001 following a referral regarding allegations that Mother hit B.J.B. The girls were placed with foster parents and underwent mental health counseling through Jewish Family Services. One of the foster parents, Jeffery Freiden ("Mr. Freiden"), began working with the family around 1999 or 2000 providing "intensive family preservation." He spent six to ten hours a week for a thirty day period inside the home and described it as "disheveled" and "chaotic" when he first arrived. Mr. Freiden discovered that Mother had not filled B.P.B.'s prescriptions, B.J.B. was running the household, the children were practically raising themselves, and there was no adult supervision. On two occasions, B.J.B. called Mr. Freiden and reported that Mother had struck her. Mr. Freiden also discovered that H.L.B. missed fifty-six days of school despite living directly across the street from the school.

On July 5, 2001, DCS developed a permanency plan for H.L.B. calling for: (1) Mother to follow through with treatment recommendations, (2) Mother to demonstrate to both DCS and a mental health provider that she understands the importance of the recommendations and how to implement them, (3) DCS to monitor Mother's follow through and provide feedback, (4) Mother to participate in an evaluation through LCCP or another licensed professional and provide DCS with a report of the results, and (5) DCS to make a referral to LCCP for an evaluation and assist Mother with scheduling the visit. Dr. Gentry evaluated the family again in 2001. Upon doing so, he found that Mother seemed to still be suffering from a psychiatric disorder and had very little insight into her own illness or those of her children. In turn, LCCP recommended that DCS terminate Mother's parental rights. Dr. Gentry also recommended that Mother undergo individual psychotherapy.

On February 12, 2002, DCS entered a revised permanency plan for B.P.B. which essentially required the same five things as listed in the permanency plan created for H.L.B., with the added requirement that Mother comply with DCS policies regarding visitation. DCS created a second revised permanency plan for B.P.B. on March 11, 2003, which added the following additional criteria for Mother to meet: (1) Mother would provide DCS with evidence that she is seeing a trained therapist and provide DCS with regular reports, and (2) work on anger management issues.

On February 21, 2002, DCS filed a petition to terminate the parental rights of Mother, Danny Brooks ("Father"), and any unknown fathers in the Chancery Court of Shelby County as to B.P.B.[2] In addition to alleging that termination was in the children's best interest pursuant to section 36-1-113(i) of the Tennessee Code, DCS alleged the following grounds for termination: (1) persistent conditions pursuant to section 36-1-113(g)(3) of the Tennessee Code, (2) substantial noncompliance with the responsibilities outlined in the permanency plans implemented by DCS pursuant to section 36-1-113(g)(2), and (3) willful abandonment by Father pursuant to section 36-1-102(1)(A) of the Tennessee Code. On August 14, 2002, DCS filed a motion to amend the petition to include a request

_____

[2] The petition and the permanency plans implemented by DCS identify Danny Brooks as the biological father of B.P.B.

to terminate the parental rights of Mother and Father as to H.L.B. DCS filed an amended petition on September 16, 2002, with the trial court stating that the grounds for termination listed in the original petition applied to this child as well.[3]

On October 4, 2002, the chancery court entered an order appointing Patricia Chavetz ("Ms. Chavetz") guardian ad litem for the children. On December 4, 2003, DCS filed an amended petition with the chancery court adding, as an additional ground for termination, the mental incompetency of Mother pursuant to section 36-1-113(g)(8) of the Tennessee Code. According to a letter submitted by Mother as an exhibit at trial, she recently started mental health treatment with Dr. Sheena Rose ("Dr. Rose"). On February 13, 2004, Mother filed a motion asking the chancery court to grant her a continuance so that Dr. Rose could conduct a joint psychological evaluation with Mother and the children. While the record does not contain an order either denying or approving this request, it is apparent that DCS refused to allow Dr. Rose to conduct the joint evaluation.

On July 2, 2004, following a hearing, the chancery court entered a final order terminating Mother's parental rights regarding H.L.B. and B.P.B. In addition, the chancery court terminated the parental rights of Father and any unknown fathers by default judgment since they failed to appear or respond to the petition. Mother filed an appeal to this Court presenting the following issues for our review:

I.      Whether the chancery court erred in terminating Mother's parental rights for failure to comply with the terms of the permanency plan;
II.     Whether the chancery court erred in terminating Mother's parental rights based on a finding of Mother's mental incompetency;
III.    Whether the chancery court erred in finding that DCS made reasonable efforts toward reunification of Mother with her children;
IV.     Whether the chancery court erred in terminating Mother's parental rights based on a finding that persistent conditions still exist and are unlikely to be remedied in the near future;
V.      Whether termination of Mother's parental rights is in the childrens' best interest; and
VI.     Whether the trial court erred in awarding DCS a default judgment against Father and any unknown fathers.

For the reasons set forth herein, we affirm the ruling of the chancery court.

## II.
### STANDARD OF REVIEW

Both the United States Constitution and the Tennessee Constitution recognize a biological parent's fundamental right to the care, custody, and control of their children. *Santosky v. Kramer*,

---

[3] The amended petition identified Danny Brooks as the putative father of H.L.B. In addition, DCS alleged that it could not ascertain the whereabouts of Danny Brooks and requested the chancery court allow service on Mr. Brooks by publication.

455 U.S. 745, 753 (1982); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993); *In re Swanson*, 2 S.W.3d 180, 187 (Tenn. Ct. App. 1999). This is not, however, an absolute right immune from state involvement, *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1989), as the state may seek to terminate a parent's parental rights in certain statutorily defined circumstances. *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 Tenn. App. LEXIS 415, at *28–35 (Tenn. Ct. App. June 3, 2003); Tenn. Code Ann. § 36-1-113(g) (2003).

In order to terminate a parent's parental rights to their minor children, the state must prove the existence of one of the statutory grounds for termination by clear and convincing evidence and that termination is in the childrens' best interest. *Santosky*, 455 U.S. at 769–70; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *In re Drinnon*, 776 S.W.2d at 97; Tenn. Code Ann. § 36-1-113(c) (2003). A finding that the state has proven the existence of any one of the statutory grounds for termination found in section 36-1-113(g) of the Tennessee Code is enough to support the trial court's decision to terminate a parent's parental rights. *In re Valentine*, 79 S.W.3d at 546; *see also In re C.W.W.,* 37 S.W.3d 467, 475 (Tenn. Ct. App. 2000).

The state is required to prove the grounds for termination by clear and convincing evidence in order "to prevent the unwarranted termination or interference with the biological parents' rights to their children." *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). This Court has described this standard in the following terms:

> Although it does not require as much certainty as the "beyond a reasonable doubt" standard, the "clear and convincing evidence" standard is more exacting than the "preponderance of the evidence" standard. *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995); *Brandon v. Wright*, 838 S.W.2d 532, 536 (Tenn. Ct. App. 1992). In order to be clear and convincing, evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992); *O'Daniel v. Messier*, 905 S.W.2d at 188. Such evidence should produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established. *O'Daniel v. Messier*, 905 S.W.2d at 188; *Wiltcher v. Bradley*, 708 S.W.2d 407, 411 (Tenn. Ct. App. 1985). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *Lettner v. Plummer*, 559 S.W.2d 785, 787 (Tenn. 1977); *Goldsmith v. Roberts*, 622 S.W.2d 438, 441 (Tenn. Ct. App. 1981); *Brandon v. Wright*, 838 S.W.2d at 536.

*State v. Howell*, No. W2004-00295-COA-R3-PT, 2004 Tenn. App. LEXIS 800, at *8–10 (Tenn. Ct. App. 2004).

In reviewing a trial court's findings of fact in a parental termination case, we are bound by the following standard of review:

> Because of the heightened burden of proof required by Tenn. Code Ann. § 36-1-113(c)(1), we must adapt Tenn. R. App. P. 13(d)'s customary standard of review for cases of this sort. First, we must review the trial court's specific findings of fact *de novo* in accordance with Tenn. R. App. P. 13(d). Thus, each of the trial court's specific factual findings will be presumed to be correct unless the evidence preponderates otherwise. Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights. *Jones v. Garrett*, 92 S.W.3d at 838; *In re Valentine*, 79 S.W.3d at 548-49; *In re Adoption of Muir*, 2003 Tenn. App. LEXIS 831, 2003 WL 22794524, at *2; *In re Z.J.S.*, 2003 Tenn. App. LEXIS 415, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *10 (Tenn. Ct. App. June 3, 2003) (No Tenn. R. App. P. 11 application filed); *Ray v. Ray*, 83 S.W.3d at 733; *In re L.S.W.*, 2001 Tenn. App. LEXIS 659, No. M2000-01935-COA-R3-JV, 2001 WL 1013079, at *5 (Tenn. Ct. App. Sept. 6, 2001), *perm. app. denied* (Tenn. Dec. 27, 2001).

*In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). We review a trial court's conclusions of law in a parental termination case under a purely *de novo* standard of review. *In re Valentine*, 79 S.W.3d at 547.

### III.
### TERMINATION OF MOTHER'S PARENTAL RIGHTS

#### A.
#### *Failure to Substantially Comply with the Permanency Plans*

We begin with Mother's assertion on appeal that DCS failed to prove by clear and convincing evidence that she failed to substantially comply with the requirements of the permanency plans implemented by DCS. Within thirty (30) days after a child enters into foster care, DCS is required to implement a permanency plan which sets forth in specific terms a statement of responsibilities that are reasonably related to the achievement of the goals set forth in the plan. Tenn. Code Ann. § 37-2-403(a) (2003). A parent's parental rights may be terminated when DCS proves by clear and convincing evidence that the parent has failed to substantially comply with the statement of responsibilities in a permanency plan. Tenn. Code Ann. § 36-1-113(g)(2) (2003). "Substantial noncompliance is a question of law which we review *de novo* with no presumption of correctness." *In re Valentine*, 79 S.W.3d at 548.

In determining whether a parent has failed to substantially comply with a permanency plan, our supreme court has provided the courts of this state with the following guidance:

> Substantial noncompliance is not defined in the termination statute. The statute is clear, however, that noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial. Black's Law Dictionary defines "substantial" as "of real worth and importance." Black's Law Dictionary 1428 (6th ed. 1990). In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement.

*Id.* We agree with the chancery court's finding that the requirements in the permanency plan, especially the requirement that Mother undergo psychological counseling, were reasonably related to remedying the conditions which necessitated foster care placement. However, we cannot agree that DCS proved by clear and convincing evidence that Mother failed to substantially comply with the requirements of the permanency plans implemented by DCS in this case.

The primary goal of the permanency plan implemented by DCS was to remedy Mother's mental illness before the children would be returned to her custody. This is evidenced by the testimony of Ginger Comstock ("Ms. Comstock"), the DCS caseworker assigned to Mother's case. Ms. Comstock testified that the main reason DCS sought to terminate Mother's parental rights was due to her failure to follow the treatment recommendations set forth by LCCP. In an effort to address Mother's mental illness, the permanency plans required Mother to follow LCCP recommendations, demonstrate her understanding of those recommendations, and provide evidence in the form of progress reports that she is seeing a mental health professional. Since these were the crucial requirements in the permanency plans, we give Mother's actions toward meeting this goal the greatest weight in determining whether she substantially complied with the permanency plans. *See In re Valentine*, 79 S.W.3d at 548.

Upon reviewing the record, we find no testimony or other evidence indicating what efforts DCS made, other than evaluating Mother four times over twenty years, to assist Mother to obtain psychological counseling to meet the goals of the permanency plans. Ms. Comstock did briefly testify concerning some of the social services agencies provided by DCS, yet Dr. Gentry's report on the evaluation he conducted in November of 1993 illustrates the insufficiency of those efforts. The report references the services offered by a Home Ties therapist, then goes on to state that "the therapist suggested that Ms. Baruchman might need more specialized therapy than they have been able to offer." In addition, the Affidavit of Reasonable Efforts filed by DCS in this case identifies Mother's need for psychological counseling, yet the section listing the services provided by DCS to aid Mother in reaching this goal merely states that "mother *was* in individual counseling." (emphasis added). Each evaluation report filed by Dr. Gentry identifies Mother's battle with mental illness and identifies her need for continued counseling, yet the record contains no evidence showing DCS

attempted to assist Mother with such counseling. In 1999 or 2000, DCS sent Mr. Freiden into the Baruchman home to conduct "intensive family preservation" for six to ten hours a week for thirty days. However, Mr. Freiden did not offer any testimony indicating he provided the type of intensive psychological counseling mandated by Dr. Gentry.

Additionally, Mother denied ever receiving a copy of the LCCP recommendations. In fact, Ms. Comstock's own testimony reveals that Mother never received a written copy of the LCCP recommendations which she was to comply with. Ms. Comstock stated that, after she received Dr. Gentry's 2001 report, "[t]he procedure is that the people from CCP discuss it with the Department and then they — usually that same day, they discuss it with the family and they go over the results with the person that they did the evaluation on." When asked if LCCP actually informed Mother of the requirements set forth by LCCP and Dr. Gentry, Ms. Comstock testified that she assumed they did, but had no personal knowledge of whether they actually did so. Dr. Gentry also testified in this case, but the record reveals no testimony by Dr. Gentry, and we are unable to find any statements in his evaluation reports, showing that he met with Mother and explained the requirements regarding mental health therapy.

Ms. Comstock did testify that, during their meetings with Mother to go over the permanency plans, DCS personnel advised Mother of the LCCP recommendations with which she needed to comply. However, even if DCS ensured that Mother at least orally received the requirements set forth by LCCP, the record reveals that it is doubtful this alone would aid Mother in completing those requirements. The testimony of the state's own witnesses demonstrated that, based on the facts in this case, placing the burden of seeking treatment upon the Mother alone would not accomplish the goal of alleviating Mother's mental illness so that she could be reunited with her children. Dr. Gentry testified that, without treatment, Mother would be unable to fix her psychological problems. In fact, Dr. Gentry stated that Mother has a "lifelong illness" that is "not curable," and she would need regular long-term therapy and medication to function. Ms. Comstock offered the following additional testimony:

> A. To me, personally, I don't feel like she flat out did not do the recommendations because she just didn't want to. I feel like that she may not have understood what we were asking her to do or what has been asked of her for years and years.

Based on the foregoing testimony, it is difficult for this Court to perceive exactly how DCS contemplated Mother would meet the goals set forth in the permanency plans.

The facts of this case are factually similar to our decision in *In re M.E.*, No. M2003-00859-COA-R3-PT, 2004 Tenn. App. LEXIS 526 (Tenn. Ct. App. Aug. 16, 2004). In that case, the mother underwent a psychological evaluation revealing several psychological problems. *In re M.E.*, 2004 Tenn. App. LEXIS 526, at *7–8. The evaluating doctor recommended that the mother undergo individual therapy, but DCS never provided the recommended services. *Id.* at *9. We concluded that, despite the numerous services provided to the mother, DCS "failed to provide the most obvious

and essential service Mother needed, the mental health services recommended by [the doctor]." *Id*. at *22–23. Accordingly, we cannot find that DCS proved by clear and convincing evidence that Mother failed to substantially comply with the permanency plan regarding the requirements relating to her mental health.

DCS also alleges that Mother failed to comply with the permanency plan requirement that she exhibit anger management skills. Once again, though DCS required Mother to work on anger management issues, the record is devoid of any evidence indicating DCS helped her achieve this goal. In fact, Ms. Comstock testified that DCS did not provide the anger management classes to Mother. Mother took it upon herself to go to anger management classes and presented Ms. Comstock with the certificate proving she completed the course. In finding that Mother failed to comply with the permanency plan in this regard, the chancery court relied upon the testimony offered by several witnesses, including Mother. Ms. Comstock testified that, during a supervised visit, Mother cursed the students at the facility. Mother admitted at trial that, after completing the anger management class, she was arrested for domestic violence against her boyfriend. Interestingly, DCS did not require Mother to work on her anger management issues until it implemented the March 11, 2003, permanency plan, well after filing its petition to terminate her parental rights.

Finally, the chancery court found that Mother failed to substantially comply with the permanency plans by failing to abide by the visitation rules. Specifically, the trial court found that Mother engaged in unsupervised visits or encouraged the children to leave the foster home and meet her. We find that the record supports the trial court's factual findings in every regard as to these last two requirements in the permanency plans.

As previously stated, however, when determining whether a parent substantially complied with the permanency plan, "the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548. Partial failure to comply with two of the five goals set forth in the permanency plan, especially when the requirements relating to anger management and visitation are not the main obstacles to reunification, cannot amount to substantial noncompliance. *State v. B.J.A.L.*, No. E2002-00292-COA-R3-JV, 2002 Tenn. App. LEXIS 674, at *16 (Tenn. Ct. App. Sept. 19, 2002). "Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *Id*. at 657 (citations omitted).

Ms. Comstock testified that Mother complied with two-thirds of the 2001 permanency plan; she complied with some, but not all, of the 2002 permanency plan; and over half of the 2003 permanency plan. In addition, Ms. Comstock stated that, in her opinion, Mother did substantially

comply with the permanency plans.[4]  Based on the record before this Court, we cannot say that the state proved by clear and convincing evidence that Mother failed to substantially comply with the requirements set forth in the permanency plans implemented by DCS.  Accordingly, we reverse the trial court's findings regarding this ground for termination of Mother's parental rights.

Closely related to the aforementioned issue are the efforts used by DCS in working toward reunification of Mother and the children and whether those efforts proved reasonable.  Prior to ordering that a parent's parental rights be terminated, the trial court must find that DCS has made "reasonable efforts" to "prevent the need for removal" or "make it possible for the child to return home."  Tenn. Code Ann. § 37-1-166(a) (2003); *see also In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 Tenn. App. LEXIS 160, at *22 (Tenn. Ct. App. Mar. 9, 2004).  Upon reviewing the trial court's final order, we find no mention of the reasonable efforts made by DCS in this case.  In her brief, Mother contends that the only service DCS provided toward reunification was regular visitation.  Strangely, the state's brief does not contain an argument in rebuttal to Mother's allegations on appeal regarding DCS's failure to use reasonable efforts in this case.

The legislature has defined "reasonable efforts" to mean "the exercise of reasonable care and diligence by the department *to provide* services related to meeting the needs of the child and the family."  Tenn. Code Ann. § 37-1-166(g)(1) (2003) (emphasis added).  As we have previously stated:

> In many circumstances, the success of a parent's remedial efforts is intertwined with the efforts of the Department's staff to provide assistance and support.  *State Dep't of Children's Servs. v. Demarr*, 2003 Tenn. App. LEXIS 569, 2003 WL 21946726, at *10.  Reasonable efforts entail more than simply providing parents with a list of service providers and sending them on their way.  The Department's employees must use their superior insight and training to assist parents with the problems the Department has identified in the permanency plan, whether the parents ask for assistance or not.  *In re D.V.V.*, 2002 Tenn. App. LEXIS 126, 2002 WL 225891, at *8.  However, the remedial responsibility does not rest solely on the Department's shoulders.  Parents must also make reasonable efforts to rehabilitate themselves and to remedy the conditions that required them to be separated from their children.  *In re R.C.V.*, 2002 Tenn. App. LEXIS 811, 2002 WL 31730899, at *12.

*In re C.M.M.*, 2004 Tenn. App. LEXIS 160, at *27–28; *see also In re R.C.V.*, No. W2001-02102-COA-R3-JV, 2002 Tenn. App. LEXIS 811, at *39 (Tenn. Ct. App. Nov. 18, 2002) ("Reunification

---

[4] We agree with the trial court in that the legal conclusion drawn by the DCS caseworker assigned to a case is not binding upon the courts of this state in parental termination cases.  However, this statement by the DCS caseworker is instructive when placing the anger management and visitation requirements in the proper context.

of a family is a two-way street, and the law does not require DCS to carry the entire burden of this goal.").

This is not an instance where DCS requested a parent to undergo a psychological evaluation and the parent refused. *See In re S.L.R.*, No. M2004-01565-COA-R3-PT, 2004 Tenn. App. LEXIS 880, at \*62–64 (Tenn. Ct. App. Dec. 28, 2004). Mother underwent every evaluation requested by DCS, yet Ms. Comstock expressly testified that she felt Mother did not understand what DCS required her to do. When DCS establishes a reasonable and appropriate recommendation in a permanency plan, DCS is obligated to offer reasonable assistance in helping the parent achieve that goal. *See State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 Tenn. App. LEXIS 569, at \*35 (Tenn. Ct. App. Aug. 13, 2003). The Affidavit of Reasonable Efforts submitted by DCS in this case makes no mention of their attempt to provide Mother with any assistance toward complying with the recommendations of LCCP related to her mental health.

While we have not required the efforts by DCS to be "Herculean," *In re C.M.M.*, 2004 Tenn. App. LEXIS 160, at \*25, the record in this case is devoid of any evidence, other than four evaluations conducted by Dr. Gentry spread over twenty years, showing what efforts DCS made toward helping Mother reach the goals of the permanency plans regarding her mental health issues. In addition, Ms. Comstock testified that DCS did not provide Mother with anger management classes despite requiring her to address such issues prior to being reunited with her children. While Ms. Comstock did briefly mention some of the social services agencies that were sent to help Mother, "those services were of little consequence due to the Department's failure to provide the most critical, indeed the most obvious service required by Mother, psychological counseling." *In re M.E.*, No. M2003-00859-COA-R3-PT, 2004 Tenn. App. LEXIS 526, at \*31 (Tenn. Ct. App. Aug. 16, 2004). Accordingly, we find the trial court erred in finding that DCS made reasonable efforts toward reuniting Mother and her children.

### B.
### *Mother's Mental Incompetency*

DCS filed an amended petition on December 4, 2003, to assert, as an additional ground for termination, section 36-1-113(g)(8)(B) of the Tennessee Code, which permits the trial court to terminate a parent's parental rights when:

> (i) The parent . . . of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's . . . mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future, and

-11-

> (ii) That termination of parental . . . rights is in the best interest of the
> child.

Tenn. Code Ann. § 36-1-113(g)(8)(B) (2003).[5] On appeal, Mother argues that DCS failed to clearly and convincingly prove this ground for termination because: (1) DCS refused to allow Dr. Rose to conduct a joint evaluation with the children to assess Mother's competency, (2) the evaluation conducted by Dr. Gentry in 2001 is three years old, (3) Dr. Rose's letter stated Mother posed no danger to her children, and (4) Rabbi Nathan Greenblait ("Rabbi Greenblait"), who began supervising Mother's visitation with her children at the end of 2002, testified that Mother does not pose a danger to her children.

A parent's actions regarding their inability to care for a child due to a mental disability do not have to be willful before such actions can form a basis for terminating that parent's parental rights. Tenn. Code Ann. § 36-1-113(g)(8)(C) (2003); *State v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990). When Dr. Gentry evaluated Mother in 1984 following the birth of her first child, he noted Mother to be a "very disturbed individual" presenting symptoms of schizophrenia. When he conducted a follow-up evaluation in 1985, he noted Mother had made only "slight improvement." When he reevaluated Mother in 1993, he noted "more evidence of a schizophrenic-like disorder," and the symptoms were "much more prominent and obvious." When he evaluated Mother for the last time in 2001, Dr. Gentry noted "she seemed to be suffering from a serious psychiatric disorder."

In fact, Mother freely admitted at the hearing that she has been diagnosed with borderline personality disorder, schizophrenia, bipolar disorder, and depression. During one of her evaluations with Dr. Gentry, Mother reported two prior psychiatric hospitalizations. In addition, she is currently only taking medication for her depression. Dr. Gentry testified that Mother's illness "is a lifelong illness" that "is not curable," and Mother's illness is "at best, treatable," with proper medication. The effects of this illness on her children is also demonstrated in the record. When Mr. Freiden first went to the Baruchman home, he noted the house to be "chaotic," Mother had not filled B.P.B.'s prescriptions which controlled his behavior, the children had no adult supervision, B.J.B. was given adult roles and primarily ran the house, and H.L.B. missed fifty-six days of school one year despite living directly across the street from the school. In addition, Mother admitted at trial that she struck B.J.B., and Mr. Freiden testified that B.J.B. called him twice to report Mother hit her.

The trial court placed a great amount of credibility on Dr. Gentry's testimony over that of Dr. Rose's letter. "The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court." *Weatherford v. Weatherford*, No. W1999-01014-COA-R3-CV, 2000 Tenn. App. LEXIS 837,

---

[5] The statute references "a separate, independent proceeding conducted prior to an adoption proceeding to determine if the parent . . . is mentally incompetent to provide for the further care and supervision of the child, and to terminate that parent's . . . rights to the child." Tenn. Code Ann. § 36-1-113(g)(8)(A) (2003). The termination hearing conducted by the chancery court in this case satisfies this requirement. *In re R.C.V.*, No. W2001-02102-COA-R3-JV, 2002 Tenn. App. LEXIS 811, at *38 (Tenn. Ct. App. Nov. 18, 2002).

at *4 (Tenn. Ct. App. Dec. 29, 2000) (citations omitted). It was proper for the trial court to discount Dr. Rose's letter when it contained no indication of her professional qualifications, how many times she interviewed Mother, the basis for her opinions regarding Mother's mental health, or the tests utilized to reach such conclusions. *See In re R.L.H.*, No. M2002-01179-COA-R3-JV, 2003 Tenn. App. LEXIS 414, at *27–28 (Tenn. Ct. App. June 3, 2003).

Mother's mental incompetence is further demonstrated by her conduct on the witness stand, which the trial court noted in its final order. The record reveals several instances where Mother was unable to appreciate the severity of her illness; became argumentative with the attorney for the state and called her "a liar" when discussing Mother's mental illness; became argumentative with the court; and had to be asked by the court to control herself and quit yelling. We are mindful that we are reviewing a cold record, however, these episodes offer an additional insight into Mother's present mental state. Regarding Rabbi Greenblait's testimony, while he did state he felt Mother posed no risk to the children, he also testified that he had no knowledge of any of Mother's psychological problems. Given Mother's testimony and behavior at trial, along with her documented history of severe mental illness for over twenty years, it is clear that a joint evaluation this late in the process would change little.

Despite the fact that the last evaluation conducted by Dr. Gentry occurred in 2001, the record clearly and convincingly establishes that, over the course of twenty years, Mother has demonstrated that she "is incompetent to adequately provide for the further care and supervision of the child[ren] because the parent's . . . mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent . . . will be able to assume or resume the care of and responsibility for the child in the near future." Tenn. Code Ann. § 36-1-113(g)(8)(B)(i) (2003). In addition, this ground for terminating Mother's parental rights "[does] not necessitate that the Department make reasonable reunification efforts before filing a termination petition." *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 Tenn. App. LEXIS 160, at *21 (Tenn. Ct. App. Mar. 9, 2004). Accordingly, we affirm the chancery court's finding that Mother's parental rights should be terminated based upon this ground. Having found that the record reveals DCS clearly and convincingly established this ground for termination, we need not address Mother's issue related to whether DCS has proven the existence of "persistent conditions" pursuant to section 36-1-113(g)(3)(A) of the Tennessee Code. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *see also In re C.W.W.,* 37 S.W.3d 467, 475 (Tenn. Ct. App. 2000).

## C.
### *Best Interest of the Children*

Rather than argue against the factors set forth in section 36-1-113(i) of the Tennessee Code, Mother argues that the trial court erred in finding that termination was in the childrens' best interest because the guardian ad litem failed to ask the court to appoint a separate attorney for the minor children when H.L.B. told the guardian ad litem, Ms. Chavetz, that she wished to be returned to Mother's custody. Specifically, Mother argues that Tennessee Supreme Court Rule 40(e) required

Ms. Chavetz to seek the appointment of another lawyer when she determined the minor child's best interest conflicted with the preferences of the minor child. In support of this position, Mother relies on the testimony of Ms. Comstock to the effect that H.L.B. told her four or five months before trial that she wanted to go back to her Mother and a statement in the guardian ad litem's report to the same effect.

We find no merit in this position. First, we find no mention in the record that Mother's counsel raised this issue in the chancery court so that the chancery court could have an opportunity to rule upon the issue. "It has long been the general rule that questions not raised in the trial court will not be entertained on appeal. . . ." *In re E.N.R.*, 42 S.W.3d 26, 32 (Tenn. 2001). Second, contrary to Mother's assertion, the record reveals a confused minor who, in addition to stating she wanted to remain with Mother in the months leading up to the hearing, also stated she wished to be adopted. This does not rise to the level of a child "urging" the guardian ad litem to take a position the guardian ad litem feels is contrary to the child's best interest. *See* Tenn. Sup. Ct. R. 40(e)(2) (2003).

Although Mother does not address the factors found in section 36-1-113(i) of the Tennessee Code, we find many of the statutory factors apply in this case and indicate the trial court was correct in finding termination to be in the childrens' best interest. As explained more fully *supra*, the record reveals Mother's mental illness has not been adjusted to a level which would make it safe for the children to be returned to her custody. Tenn. Code Ann. § 36-1-113(i)(1) (2003). The children have been in foster care for a significant part of their childhood, and Dr. Gentry testified that it would not be harmful to the children to break the maternal bond because their relationship with Mother was intermittent anyway. Tenn. Code Ann. § 36-1-113(i)(4) (2003). Several witnesses testified that, since being placed in foster care, the children have improved emotionally, physically, and academically. Tenn. Code Ann. 36-1-113(i)(5) (2003). Mother admitted to striking her oldest daughter, and Mr. Freiden testified that B.J.B. called him on two occasions to report that Mother hit her. In addition, Mother admitted to being involved in a domestic violence incident with her boyfriend. Tenn. Code Ann. § 36-1-113(i)(6) (2003). Finally, as more fully demonstrated *supra*, Mother's mental status would be detrimental to the children to the extent it prevents her from providing a safe, nurturing environment for these children. Tenn. Code Ann. § 36-1-113(i)(8) (2003). Accordingly, we find the chancery court did not err in finding termination of Mother's parental rights to be in the childrens' best interest.

## IV.
### DEFAULT JUDGMENT AGAINST FATHERS

In her final issue raised on appeal, Mother alleges the trial court erred by granting DCS a default judgment against Father and any unknown fathers, thereby wrongfully terminating their parental rights. Mother cites to Rule 55.01 of the Tennessee Rules of Civil Procedure requiring written notice of an application for default judgment. Tenn. R. Civ. P. 55.01 (2003). Since Mother suffered no injury as a result of the trial court's terminating the parental rights of Father and any unknown fathers by default judgment, Mother lacks standing to contest this issue on appeal. *See*

*State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 Tenn. App. LEXIS 569, at *39 (Tenn. Ct. App. Aug. 13, 2003); *In re Estate of Price*, No. M2002-00332-COA-R3-CV, 2002 Tenn. App. LEXIS 931, at *6–8 (Tenn. Ct. App. Dec. 31, 2002); *In re Adoption of M.J.S.*, 44 S.W.3d 41, 58 (Tenn. Ct. App. 2000).  Accordingly, this issue is without merit.

## V.
### CONCLUSION

For the reasons set forth herein, we affirm the chancery court's decision to terminate the parental rights of Dale Baruchman to her two minor children.  Costs of this appeal are to be taxed against the Appellant, Dale Baruchman, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, JUDGE